ELLIS, Judge.
On the morning of September 12, 1950* S. J. Bergeron was on his way to work in his automobile, and being in the need of help stopped his car when he saw the plaintiff, James Morgan, standing on the street and engaged him to go to work for him,, whereupon Morgan got into the car with Bergeron and soon afterward Bergeron’s automobile was involved in an intersec-tio'nal collision with a car driven by the defendant Kreppier, which car was insured by defendant, American Policy Holders Insurance Co.
The liability of the defendant Kreppier was admitted and the case was submitted to the lower court solely on the question of the amount of the award to be made to the plaintiff. The lower court with well written reasons for judgment awarded the plaintiff damages for the loss of 10 days work at $1.07 an hour dr $85.60, and the sum of $250 for pain and discomfort and doctor bills totalling $61, fixing as the total, $396.-60, together with interest at the legal rate-from judicial demand until paid and for all costs including the expert fees of the four doctors at $25 each or $100. '
*140 The plaintiff has appealed from this judgment and the only question before this court is the quantum.
Plaintiff suffered as a result of the collision a laceration of his forehead, slight injury to his left knee, and injury to his left thumb. The injury to his forehead and knee were in no way serious and the extent of the injury to his thumb is really the only question before the Court.
Immediately after the accident the plaintiff was taken by Bergeron to Dr. H. W. A. Lee who testified with regard to his left thumb that: “It was sore. I thought it had been dislocated. It was painful to motion and what I thought had happened was he had dislocated it and it had popped back in place. I didn’t have to get it back in place at all.” Dr. Lee last saw plaintiff October 3, 1950 at which time he did not think he would have any permanent injury. This doctor stated that the plaintiff suffered some pain and that he was still complaining on October 3, 1950.
On September 12, 1950, the date of the accident, Dr. Lester J. Williams now deceased, x-rayed plaintiff’s thumb and according to a copy of this report the thumb showed no evidence of fracture or other signs of boney pathology.
Dr. David S. Malen, a radiologist of Baton Rouge, at the request of Dr. James R. Godfrey, x-rayed the left thumb of the plaintiff on or about November 6, 1950, and testified that he found old ununited fractures head of first metacarpal without joint involvement. This doctor positively testified that he found no evidence of any new fracture in the plaintiff’s thumb but that the appearance of the old fractures were of a longer duration than September 12, 1950. In fact, his positive testimony was that these fractures probably could not have been caused by the accident of September 12, 1950.
, As counsel for the plaintiff is basing his request for an increased amount upon the supposition that the plaintiff’s thumb was fractured in the accident of September 12, 1950, it might be well’to go somewhat into detail with regard to, the testimony. '
On re-direct examination by counsel for plaintiff, Dr. Malen testified- as follows :
“Q. As I understand it you really can’t say for certain when that fracture did take place? A. From the appearance I would be more apt to consider that those fractures occurred possibly years previously. If however, it was a period of six months it might 'be more difficult to assess definitely. It is more unlikely that these could have occurred some two months prior to the date of the examination.
“Q. But even though unlikely and unusual it could have happened? A. No, I don’t think so in my own experience.
“Q. If you had the pictures taken right after the accident for comparison you could be better able to express an opinion about that, couldn’t you? A. Its a difficult position to be .placed in. However, in my opinion and in my experience as a radiologist and having been in radiology since 1940, .based, upon that experience I would say the shadows probably would have been the same in appearance if they had been made shortly after the examination, that is if the examination had been made immediately after the injury.
“By the Court: Q. And in your, opinion and from their appearance it indicates to you they are older than the date of the accident here involved? A. I would say the likelihood is the pictures would have indicated at that time an old injury.”
Dr. Louis Mayer, witness on behalf of defendant, who practised general surgery in Baton Rouge, testified that he examined the plaintiff on September 17, 1950, and testified as follows:
“The man had a one and one-half inch abrasion on the right side of his forehead, and he had evidence of mild braises of both knees and a moderate degree of swelling of the left thumb, and he had dental caries (cavities) with poor upper and lower partial dental plates.”
He further testified that he had occasion 'to examine an x-ray of plaintiff’s left thumb taken by Dr. Lester Williams on the 12th of September, 1950 and that the report of Dr. *141 Williams as a result of these x-rays stated that they revealed no evidence of fracture or other honey pathology in the left thumb. He again examined the plaintiff on October 15th, three days prior to the trial of this case, and found no evidence of residual injury to his knees or to his head, some stiffness of the left thumb, including the metacarpal of the thumb, no evidence of swelling however was present. His range of motion appeared to be limited voluntarily. This doctor was asked by the Court if he thought the plaintiff was “putting on” and he answered, “I think he was afraid to move his hand. This man to me has the impression he has an ununited fracture there,” and because of this the doctor did not think that plaintiff had been using his thumb and that the stiffness was the result of this nonuse.
Dr. Malen sent plaintiff to Dr. Robert and Dr. Ball for further x-rays of the thumb and they could find no interference with the cartilagenous joint surfaces. They did find some medical evidence which merited the taking of x-rays of the opposite thumb for comparison, and after doing that they concluded that the changes which were visible in the left thumb could conceivably be due to an old fracture, but Dr. Robert and Dr. Ball were also of the opinion that there was nothing to interfere with the free motion of the joints and because of this Doctor Mayer concluded that any stiffness existing in the plaintiff's thumb was caused by voluntary nonuse.
The x-rays taken by Dr. Williams, who reported no evidence of fracture, were lost and were, therefore, not available for comparison.
Dr. Mayer was of the opinion that the range of motion in the plaintiff’s thumb was •definitely less than it should be but when the doctor attempted to move the thumb plaintiff would resist.
Dr. Geheber, who specialized in the practice of radiology, was practicing with Dr. Lester J. Williams in Baton Rouge on September 12,. 1950, and made x-ray pictures of the left thumb of plaintiff along with Dr. Williams. He testified that there was no ■evidence of a fracture or other signs of .osseous pathology.
In the record we have the report of Dr. James Godfrey who examined the plaintiff at the request of his counsel on the 6th of November, 1950. As a result of his examination of plaintiff’s thumb he stated:
’ “ * * * James held the left thumb rigidly extended and could not be persuaded to flex it at all, although passive flexion could be done by me to about 75% of normal. I believe some active flexion was present but I was unable to persuade James to exhibit it. He insisted in holding the digit rigidly extended in a foolish manner, with the extensor muscles of the forearm obviously tense in this activity, and I was unable to get him to flex it at all. James had no complaints for the in-terphalangeal j oint but he said that the metacarpal phalangeal joint ‘is bad’ and that the limited motion was located thereof. Examination did indicate'that this joint was a trifle swollen and a little harder than it should be. I had this man’s left thumb x-rayed by Dr. David Malen and received the following report dated November ■ 6, 1950:
“ ‘Diagnosis — Old Ununited fractures head of first metacarpal without joint involvement.
“ ‘Comment — The right thumb was examined in multiple prejections with special reference to the first metacarpal-phalangeal region.
“ ‘Two smooth, rounded fragments of bone are seen adjoining the distal metaphysis on its palmar and ulnar aspect. The fragments are the evidence for an old ununited fracture at the junction of the diaphysis and head of the proximal metacarpal. A fracture, recent or'old, into the joint is not seen to be present. A dislocation is not present.’
“This man has old united Fractures at the head of his first left- metacarpal bone without involving the metacarpal-phalangeal joint. These fractures, as stated above, are definitely old and I do not know whether or not they predate his accident of August, 1950. If they were received then, this man is *142 disabled at this time due to his traffic accident, and be disabled at least partially until healing of the fractures takes place. However, in the past I have known of an occasional case where people, especially members of the colored race, have attempted fraud following an accident, and this man was uncooperative in his examination. It might be advisable for you to check on the x-rays of this thumb taken by Dr. Williams soon following the accident to see whether or not those x-rays show fractures which appeared old even then. If so, this man is -attempting fraud and it would do my soul good to see him prosecuted for such.”
In addition to the above detailed testimony, we have the testimony of the plaintiff himself which shows that he was an uneducated colored man who had progressed to the fifth grade in school, and whom, we believe, was possibly sincere in thinking that his thumb was more seriously injured than the evidence warranted. However, he was able to gather hay and do some other manual labor within a week after the accident. We agree with the finding of the trial court that “the plaintiff shows no ill effects from his thumb injury and by this I mean, no genuine impairment of flexion; and, if the medical testimony is to be considered, there is no reason why he can not use his entire left hand in a normal and usual way.”
The lower court further stated:
“I have been cited to a decision of the New Orleans Court of Appeal, Coste v. H. G. Hill Stores, Inc., 178 So. 512, where the plaintiff had a limitation -of 50% of his index finger in which the total award was only $347.50, including medical expenses and loss of time from his employment.
“If as stated by Dr. Godfrey in his report the old fractures shown in the x-ray pictures taken by Dr. Malen in November 1950 were received as a result of the accident in question, plaintiff had not as of that date fully recovered. However, the preponderance of the evidence is that these fractures (if there were fractures) were of long standing and unrelated to the accident. It is strange that on the very date of the accident, Dr. Williams found no fractures at all.
“At any rate, in the light of the testimony, I am unable to hold that the bone in this man’s thumb was fractured as a result of the accident. I am of the opinion that the injury to his thumb consisted only of a sprain, which condition has long since healed.”
The preponderance of the medical testimony is to the effect that any fractures were old and there was no reason from the medical testimony why this man should not have been able to use his thumb in a normal manner.
Counsel for plaintiff contends that his disability had been proven at least up until the time of Dr. Godfrey’s report on November 27, 1950. This contention was based upon Dr. Godfrey’s statement in his report in substance that if comparison of the pictures taken September 12, 1950 in the office of Dr. Williams with those taken by Dr. Malen in November indicated that the fractures reported by Dr. Malen had been sustained in the accident of September 12, 1950, then the plaintiff was still disabled and counsel then argues that the preponderance of the evidence shows that James Morgan did sustain such fractures in the accident. We cannot agree with this for the reasons stated, and are, therefore, of the opinion that the award for lost earnings for two weeks is correct.
On the question of pain and suffering and mental anguish, counsel for plaintiff contends that $250 was entirely too low. The trial judge relied in part on the case of Coste v. H. G. Hill Stores, Inc., supra, while counsel for plaintiff argues that the case of Boucher v. Louisiana Coca-Cola Bottling Co., Ltd., La.App., 46 So.2d 701, 703, wherein an award of $2,000 for an injury was approved is more in line with the proven facts of the present case. We cannot agree with counsel’s statement or contention, for in that case the Court stated:
“The wage earned by Boucher at the time of the injury was $50 per week, and the time lost from his work was *143 eleven weeks. His physician’s bill, cost of medicines, X-rays and anesthetic approximated $195. The judgment appealed from awarded him $2,000 and taking into consideration the nature of the injury, the extended term of treatment, 'the scar, and the permanent disability, together with the financial loss sustained by plaintiff, we believe that the judgment is correct and does substantial justice * *
 Counsel for plaintiff argues that even if the case of Coste v. H. G. Hill Stores, Inc., supra, is considered contrdl-ling, nevertheless the award in this case tested by that standard would be inadequate. This argument is based upon a comparison of the purchasing power of the dollar in 1938 when the Coste case was decided as compared to the purchasing power of the dollar in September, 1950. There is merit in such an argument, and we have decided to increase plaintiff’s award for physical injuries, pain, suffering and mental anguish to $450.
As thus amended the judgment of the District Court is affirmed.